# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MARK HILDEBRANT,

    *Plaintiff,*

vs.

Case No. 6:12-CV-1323-EFM

SEDGWICK COUNTY SHERIFF, JUSTIN MAXFIELD, SCOTT BURDETT, ANDREW DODGE, AND ERIC SLAY,

    *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Mark Hildebrant ("Plaintiff") seeks monetary damages, including actual and punitive damages and attorney's fees, from Defendants Sedgwick County Sheriff Department ("the Department") and Deputies Justin Maxfield ("Maxfield"), Scott Burdett ("Burdett"), Andrew Dodge ("Dodge"), and Eric Slay ("Slay") (collectively referred to as "Defendant Deputies"), for mental anguish, suffering, permanent disability, and loss of enjoyment of life under 42 U.S.C. § 1983. Defendants now move for partial summary judgment (Doc. 41). For the reasons stated below, Defendants' motion is granted in its entirety.

## I.     Factual and Procedural Background[1]

This case arises out of a pursuit and use of force by Sedgwick County Sheriff's Deputies in the 5500 block of North Maize Road in Sedgwick County, Kansas, on December 30, 2010. Because of the nature of the case, Plaintiff and Defendants disagree as to some of the facts.

On December 30, 2010, at 2:35 a.m., Dodge attempted to stop a reported stolen vehicle on West Kellogg Avenue in Sedgwick County, Kansas. Instead of pulling to a stop upon the activation of Dodge's emergency lights, the suspect vehicle, driven by Colt McCammon ("McCammon"), fled, engaging Dodge, as well as deputies Maxfield and Burdett and officers from other law enforcement agencies, in a twenty-three minute pursuit. The suspect vehicle reached speeds as high as eighty miles per hour, failed to stop at multiple stoplights and stop signs, and crossed into oncoming traffic. Plaintiff, a passenger in the car, claims that he repeatedly begged McCammon to pull over or allow him to exit the vehicle, to no avail. Defendants allege that Plaintiff and McCammon threw objects, including illegal drugs, out of the vehicle's windows during the pursuit.

After being "spike stripped" multiple times, the suspect vehicle came to a stop at 5500 North Maize Road at approximately 2:58 a.m. The details of what happened next are vigorously contested by both parties. According to Plaintiff, Defendant Deputies and other officers ordered Plaintiff, who was unarmed, out of the car. Plaintiff complied, offering no resistance. Instead of merely detaining him, officers screamed obscenities at Plaintiff, calling him a "mother***ker." Defendant Deputies allegedly "bull rushed" and gang tackled Plaintiff, knocking him to the ground and instantly breaking his neck. Plaintiff alleges that the deputies then dragged him to

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts and they are related in the light most favorable to the non-moving party.

the side of the road and ordered him to get up, at which time Plaintiff informed the deputies that they had broken his neck. According to Plaintiff, rather than immediately seeking medical attention, the deputies just left him handcuffed on the ground and made inappropriate comments about his alleged injury.

In contrast, Defendants allege that Plaintiff immediately exited the stopped vehicle before being told to do so and subsequently failed to follow the deputies' verbal commands to face away, walk backward toward them, and keep his hands above his head. Instead, Plaintiff dropped his hands, "flipped off" the deputies, and walked directly toward them while bringing his hands to his waist. According to Defendants, when Plaintiff failed to follow the deputies' commands, two of the deputies grabbed Plaintiff and used their body weight to take him to the ground. These deputies, plus one other, then restrained Plaintiff, who was resisting, and administered strikes to his shoulder, upper thigh, and ribs. At no time did Plaintiff inform the deputies that he was a reluctant participant in the stolen vehicle.

Less than three minutes after the deputies took Plaintiff to the ground, Emergency Medical Services ("EMS") was summoned to the scene. The EMS crew was en route at 3:03 a.m. and arrived on scene at 3:14 a.m. Plaintiff was treated and taken to a local hospital. Plaintiff now alleges that, as a result of Defendant Deputies' conduct, he sustained a spinal cord injury that caused him to lose the use of his legs and has confined him to a wheelchair. While Defendants acknowledge that Plaintiff incurred significant cervical injuries from the confrontation, they allege that Plaintiff had pre-existing physical conditions in his neck, including a prior cervical fusion and spinal stenosis, which made him significantly more susceptible to injury. Defendants allege that Plaintiff did not inform the deputies of this pre-existing condition.

Plaintiff filed this suit on August 30, 2012, alleging the following: (1) excessive use of force, (2) failure to train, (3) failure to seek medical attention, and (4) a state law claim of battery. On November 20, 2013, Defendants filed a motion for partial summary judgment on Plaintiff's failure to train, failure to seek medical attention, and battery claims. On January 7, 2014, Plaintiff requested a hearing on this matter. The Court held oral on May 28, 2014.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2] A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[3] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[5] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits – conclusory allegations alone cannot survive a motion for summary judgment.[6] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[7]

---

[2] FED. R. CIV. P. 56(a).

[3] *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[5] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[6] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Analysis

**A. Battery**

In his Complaint, Plaintiff pled a state tort claim of battery against the individual Defendant Deputies.[8] Under Kansas law, any action for battery must be brought within one year.[9] The incident in question occurred on December 30, 2010. On November 29, 2011, Plaintiff filed a notice of claim pursuant to K.S.A. § 12-105, which requires any person who has a claim against a municipality that could give rise to an action under the Kansas tort claims act to "file a written notice . . . before commencing such action."[10] Once such notice is filed, "no action shall be commenced until after the claimant has received notice from the municipality that it has denied the claim or until 120 days has passed following the filing of the notice of the claim, whichever occurs first."[11] The statute further provides that

> [n]o person may initiate an action against a municipality unless the claim has been denied in whole or part. Any action brought pursuant to the Kansas tort claims act shall be commenced within the time period provided for in the code of civil procedure or it shall be forever barred, except that, a claim shall have no less than 90 days from the date the claim is denied or deemed denied in which to commence an action.[12]

Here, a denial of Plaintiff's claim was sent to counsel on March 21, 2012. Plaintiff's ninety-day period within which to commence an action for battery therefore expired on June 21, 2012. Plaintiff did not file his claim in this Court until August 30, 2012, more than two months after the statutory deadline under K.S.A. § 12-105b(d) and long after the one-year statute of

---

[8] Complaint, p. 4.

[9] K.S.A. § 60-514(b).

[10] K.S.A. § 12-105b(d).

[11] K.S.A. § 12-105b(d).

[12] K.S.A. § 12-105b(d).

limitations for battery had expired. In his Complaint, Plaintiff failed to present any argument or justification for tolling the statute of limitations. In his response to Defendants' motion for summary judgment, Plaintiff acknowledged that the statute of limitations has run on this claim.[13] As such, Defendants' motion for summary judgment with regard to Plaintiff's state law battery claim is granted and the claim is dismissed.

### B. Failure to Seek Medical Treatment

In his Complaint, Plaintiff alleged that Defendant Deputies "increased [his] susceptibility to injury . . . by *failing to provide medical attention or human decency* after they had broken his neck."[14] However, the Pretrial Order (Doc. 40) does not reflect such a claim. In his response to Defendants' motion for summary judgment on this claim, Plaintiff states that he "does not make a failure to provide medical care [argument] under the Eighth Amendment in the pretrial order."[15] Given this response, the Court now assumes that Plaintiff no longer wishes to pursue a failure to seek medical attention claim. As such, Defendants' motion for summary judgment on this issue is granted and any such claim, "whether never made or now abandoned," to use Defendants' words, is dismissed.

### C. Failure to Train

The bulk of Defendants' motion concerns Plaintiff's allegation against the Department for failure to train. According to Plaintiff, the Department is liable under 42 U.S.C. § 1983 for failing to train its deputies in the proper use of force. Unlike a typical failure to train claim, however, Plaintiff acknowledges that the Department provided, and Defendant Deputies

---

[13] Doc. 46, p. 2 n.1.

[14] Doc. 1, p. 3.

[15] Doc. 46, p. 2 n.1.

received, the proper initial and continuing training as required by Kansas law. Instead, Plaintiff argues that the Department failed to *reinforce* this training. It is this lack of reinforcement, Plaintiff claims that led to his injury. In response, the Department argues that Plaintiff cannot establish that the training and policies of its deputies concerning use of force violate applicable constitutional standards. Upon review, the Court agrees.

Section 1983 states, in relevant part, that "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."[16] A municipality may be sued as a "person" under § 1983.[17] A municipality, however, will not be held liable merely for the actions of its employees.[18] A plaintiff must establish that it was the municipality's policy or custom that caused the constitutional deprivation.[19] "In the absence of an explicit policy or an entrenched custom, 'the inadequacy of police training may serve as a basis of § 1983 liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact."[20] The well-established elements of a failure to train claim under § 1983 require a plaintiff to show that:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the

---

[16] 42 U.S.C. § 1983.

[17] *See Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

[18] *Smith v. City of Okla. City*, 696 F.2d 784, 786 (10th Cir. 1983) (citing *Monell*, 436 U.S. at 690-91).

[19] *Id.*

[20] *Bell v. City of Topeka, Kan.*, 496 F. Supp. 2d 1182, 1192 (D. Kan. 2007) (quoting *Newell v. City of Salina, Kan.*, 276 F. Supp. 2d 1148, 1156 (D. Kan. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.[21]

Defendants argue that Plaintiff's claim must fail because, even assuming that Plaintiff can establish the first and second elements, he cannot provide evidence to support the third and fourth requirements under this standard.[22] The Court agrees.

As to the third requirement, there is no evidence that inadequate training demonstrates deliberate indifference on the part of the Department. To find deliberate indifference, a plaintiff must show that "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'"[23] Ordinarily, a plaintiff can make a case for deliberate indifference by "proving the existence of a pattern of tortious conduct."[24] In a few circumstances, however,

> [d]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.[25]

Plaintiff argues that the Department "should have been on notice that [its] training program was not working."[26] To this point, Plaintiff points to two cases, *Bruner-McMahon v.*

---

[21] *Allen v. Muskogee, Okla.*, 119 F.3d 837, 841-42 (10th Cir. 1997) (citing *Zuchel v. City and Cnty. of Denver*, 997 F.2d 730, 734-35 (10th Cir. 1993)). *See also City of Canton*, 489 U.S. at 389-91.

[22] Defendants concede, for purposes of this motion only, that Plaintiff satisfies elements one and two.

[23] *Bell*, 496 F. Supp. 2d at 1192-93 (quoting *Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 390)).

[24] *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998)).

[25] *Id.*

[26] Doc. 46, p. 14.

*Staton*,[27] and *Richard v. Sedgwick County*,[28] both of which involve incidents between *detention* deputies and inmates in the Sedgwick County Jail. Defendants contend that detention deputies are not commissioned law enforcement officers and therefore do not receive the same training as those in the field, such as Defendant Deputies. Plaintiff offers no evidence to the contrary. Plaintiff offers no other evidence that what happened to Plaintiff was a "highly predictable or plainly obvious consequence" of the Department's action or inaction with regard to training its deputies in the field.

Plaintiff also spends a considerable amount of time and effort comparing the facts at hand to those of Tenth Circuit cases, namely *Allen v. Muskogee*,[29] *Brown v. City of Denver*,[30] and *Paul v. City of Altus*.[31] In *Allen*, the plaintiff's decedent was killed by police officers when he failed to put down a gun while threatening to commit suicide. The plaintiff argued that the officers "rushed" the decedent, who was already in a mentally precarious state, causing the decedent to point his gun at the officers which in turn caused the officers to open fire. On appeal, the Tenth Circuit overturned the district court's grant of summary judgment, noting the testimony of the plaintiff's expert that the department's training was flawed. The appellate court also noted that other officers in the department testified that the officers in question acted in accordance with their training. According to the Court, this was enough to support an inference that the need for

---

[27] 2013 WL 101598 (D. Kan. Jan. 8, 2013).

[28] 2012 WL 4794588 (D. Kan. Oct. 5, 2012).

[29] 119 F.3d 837 (10th Cir. 1997).

[30] 227 F.3d 1278 (10th Cir. 2000).

[31] 1998 WL 94606 (10th Cir. Mar. 5, 1998).

different training was so obvious and the inadequacy so likely to result in a constitutional violation that the municipality could reasonably be said to have been deliberately indifferent.

In *Brown*, the plaintiff was involved in a traffic dispute with the defendant, an off-duty police officer who was out of uniform and driving an unmarked car. The two men exchanged hand gestures and, at a stoplight, the defendant got out of his car, drew his service revolver, pointed the gun at the plaintiff's face, and shouted that he was a police officer. The plaintiff made a U-turn and the defendant followed. The plaintiff pulled over in an attempt to get the defendant's license plate number at which point the defendant stopped, got out of his car, and drew his weapon, allegedly in accordance with the department's "always armed/always on duty" policy. When the plaintiff attempted to drive away, the defendant fired several shots into the car, hitting the plaintiff. A jury returned a verdict for the plaintiff on his failure to train claim. On appeal, the Tenth Circuit noted that the police department's "always armed/always on duty" policy was part of the department's written regulations. Expert testimony established that such policies presented serious safety risks. Therefore, the appellate court concluded that the jury had been presented with sufficient information to conclude that the City's policymakers were aware of and deliberately indifferent to the risks presented by the training program's deficiencies.

In *Paul*, which Plaintiff argues is the most factually similar to the case at hand, the plaintiff, a partial quadriplegic, was the passenger in a stolen car. Police officers stopped the car and ordered the plaintiff passenger out of the vehicle. The plaintiff told the officers that he could not get out because he was paralyzed. The officers again ordered the plaintiff to get out of the car. The plaintiff again informed the officers that he was paralyzed. The officers then grabbed the plaintiff by his neck and throat, jerked him out of the car, and threw him to the ground, kicking him. One of the officers placed his knees on the plaintiff's neck and back while

-10-

handcuffing him.  During this altercation, the plaintiff became unconscious.  The plaintiff was subsequently treated for a fractured neck and strained hip.  The district court granted summary judgment in favor of the defendant city with regard to the plaintiff's failure to train claim.  On appeal, the Tenth Circuit, relying on testimony from an on-scene officer that officers were trained to place their knees on a suspect's neck despite the specific written training materials that instructed officers *not* to undertake such an action, reversed summary judgment.

None of these cases support Plaintiff's argument.  There is no evidence that the Department's training and/or policy was flawed, as was the case in *Brown*.  In fact, Plaintiff concedes that the Department's policy and training were acceptable.  Nor is there any evidence that Defendant Deputies were trained to act in contravention to the Department's written and stated policies and training, as in *Paul*.  Perhaps the most factually similar case is *Allen*, where the appellate court relied on testimony of supervisory officers who stated that the officers in question acted in accordance with their training which, the plaintiff's expert opined, *must* have been flawed, given the inherent danger in "rushing" a mentally disturbed individual.

During oral argument, Plaintiff vigorously argued that the case now before this Court is identical to the situation in *Allen*: Defendant Deputies "gang-tackled" Plaintiff in order to gain control of the situation.  During deposition testimony, Defendant Deputies, as well as the former Sedgwick County Sheriff testified that Defendant Deputies handled the situation exactly how they had been trained. Therefore, according to Plaintiff's expert, retired Johnson County Sheriff Currie Myers ("Sheriff Myers"), the training *must* have been flawed.  While, on its face, Plaintiff's argument seems identical to that in *Allen*, there is one critical difference: Plaintiff's expert conceded that the Department provided, and therefore Defendant Deputies had, the proper initial training.  No such concession was made in *Allen*.

-11-

The Court acknowledges Sheriff Myers' conclusion in his affidavit that the Department "failed to either train or manage their officers in a way to reflect the training doctrine and polices provided by the department. The department failed to provide the specific type of training needed to deploy less than lethal weapons and/or to be involved in use of force situations."[32] However, the Court also notes that in the subsequent two paragraphs of the affidavit, Sheriff Myers concludes as follows:

> It is obvious that the department failed to *reinforce* the training and provide management oversight regarding the use of force, force continuum methodologies and conflict resolution skills. This is just as important as the original training. The department did not ensure that the training concepts provided to the officers were *understood* by those officers, and did not provide a method of reinforcing that the officers understood and comprehended the training.
>
> Simply receiving training is not enough. Based upon my review of the training materials, *the deputies most likely had the appropriate initial training*. That, however, is only part of the duties of the Sheriff's office. The office must *reinforce* the training and make certain that it is understood. It is clear that that was not happening in the Sedgwick County Sheriff's office. Both the deputies and the sheriff thought that the deputies conduct on the evening of December 30, 2010 was consistent with their training. *It was not*.[33]

Additionally, Sheriff Myers states, in paragraph seventeen of his affidavit that

> [t]he failure to train the deputies led directly to the injuries sustained by Mr. Hildebrant. They, as well as the Sheriff, believed they were following their training and that they had handled the situation correctly. The Sheriff's failure to reinforce the use of force continuum and failure to make certain that the[] deputies understood it directly led to the gang tackling and Mr. Hildebrant's injuries."[34]

However, this conclusion must be seen as directly modifying the previous paragraph, which discusses the Department's training of its deputies on the use of a Taser.

---

[32] Doc. 46, Attachment 3, p. 4-5.

[33] Doc. 36, Attachment 3, p. 6 (emphasis added).

[34] Doc. 46, Attachment 3, p. 7.

In Sheriff Myers' report itself, he makes the following conclusions:

- The department failed to either train or manage their officers in a way to reflect the training doctrine and policies provided by the department

- The department failed to provide the specific type of training needed to deploy less than lethal weapons and/or to be involved in use of force situations

- The department failed to provide training and management oversight regarding the use of force, force continuum methodologies and conflict resolution skills.[35]

However, the balance of the report focuses on Defendant Deputies' failure to learn and/or follow the training provided by the Department:

- The inability of the officers to translate from lethal force to less than lethal use of force *as trained by the department*

- The officers failed to follow protocols and standards *as provided by the training doctrine of the department*

- The officers failed to apply the use of force continuum *as provided and trained by the department*

- The officers in the video did not apply the use of force continuum *as trained and provided by the department*

- The officers *have been trained* in the Force Continuum and the levels of control used in the force continuum process

- Officers did not apply the mechanics of arrests *[as] provided by [the] training doctrine*

- The officers did not communicate or verbalize to the subject *according to [the] training doctrine*

- The officers did not take advantage of their Reactionary Gaps *as provided by [the] training doctrine*

- The officers *were provided specific training on verbalization*

---

[35] Doc. 46, Attachment 2, p. 3.

- The officers *failed to use written and training standards* held regarding the use of force

- The officers *failed to use [the] training doctrine* in the use of force

- The officers failed to follow the "One Plus One Theory" *as provided by [the] training doctrine*

- The officers did not follow the Principles of Controlling Resistance *as provided by [the] training doctrine*

- The officers did not follow the Principles of Controlling Resistance *as provided by [the] training doctrine* regarding balance displacement

- The department did not ensure that the training concepts *provided* to the officers were *understood* by those officers, and did not provide a method of *reinforcing* that the offers *understood and comprehended* the training

- That the officers *failed to follow* written standards and protocol

- That the officers failed to follow [the] training doctrine *as provided* by the department.[36]

In fact, the very last substantive paragraph of Sheriff Myers' report concludes:

> If the policy and training doctrines would have been used by the officers as required and if the department would have ensured their officers understood the training, and managed their officers according to that training, then the circumstances of the arrest would have been very different.[37]

These statements and conclusion, taken as a whole, suggest, at most, a failure to learn or failure to manage claim. The first of these possibilities concerns the remaining issue not before this Court on summary judgment, namely the claim of excessive force against the individual Defendant Deputies. The second claim, failure to manage, is not one alleged by Plaintiff.

---

[36] Doc. 46, Attachment 2, pp. 3-7.

[37] Doc. 46, Attachment 2, p. 7.

In any event, the evidence shows that Defendant Deputies were adequately trained in use of force techniques. Each of the officers received more than the amount of basic law enforcement training required by Kansas law. Kansas law requires, at a minimum, 560 hours of accredited instruction and training at the Kansas Law Enforcement Training Center prior to being certified as a law enforcement officer. The parties agree that Maxfield graduated from the training academy in 2008 with 889.5 hours of instruction, Burdett in 2007 with 888 hours of instruction, Dodge in 2006 with 896 hours of instruction, and Slay in 2008 with 896 hours of instruction. This instruction included training on the Department's policies and regulations as well as the use of force. Following their certification, each of Defendant Deputies completed an additional eight weeks of field training with one or more field training officers. Additionally, each of Defendant Deputies completed the required annual forty hours of continuing law enforcement education every year since their certification.[38] Plaintiff does not allege that this initial or continuing education was "inadequate as compared to any recognized or accepted law enforcement standards."[39] Rather, Plaintiff argues that

> [t]he department did not ensure that the training concepts provided to the officers were *understood* by those officers, and did not provide a method of *reinforcing* that the officers understood and comprehended the training . . . The office must reinforce the training and make certain that it is understood. It is clear that was not happening in the Sedgwick County Sheriff's Office.[40]

Absent Plaintiff's assertion, he offers no evidence to show that such reinforcement was not happening in the Department. Unlike in *Allen*, where the expert's deposition was over 300

---

[38] The one exception to this is Dodge, who did not complete his annual training in 2012 due to being on active military duty.

[39] *Bell*, 496 F. Supp. 2d at 1193 (quoting *Newell*, 276 F. Supp. 2d at 1158).

[40] Doc. 46, p. 7 (emphasis added).

pages in length and set forth the particular errors in the training, neither Plaintiff nor his expert state why or how such reinforcement was lacking. As Defendants question, "[w]ere there not enough hours spent in continuing training (despite the fact that annual certification standards were met)? Was an incorrect technique taught in how to restrain the suspect? Did the deputies fail to instruct the suspect in how to exit the vehicle without appearing as a threat to [him]?"[41] This Court cannot find, in this Circuit, or in any other circuit for that matter, an instance where a plaintiff has been successful on a failure to *continually* train and reinforce.[42] Thus, the Court concludes that Plaintiff has failed to show any inadequacies in the Department's training sufficient to show deliberate indifference.

Plaintiff also drew the Court's attention to the unpublished Tenth Circuit case *Herrera v. Bernalillo County Board of County Commissioners*[43] for the proposition that a "gang tackle" constitutes excessive force. In *Herrera*, the Plaintiff was attending a party at a private home. Police officers were called to the scene to respond to a noise complaint. The plaintiff was subsequently ordered by the officers to leave the party and was cited for being a minor in possession of alcohol. Around this same time, a neighbor notified the local sheriff's department about a man who had been hiding in the bushes on her property and who had cursed at her when asked to leave. The neighbor indicated the general direction in which the man had fled and the deputies pursued the man on foot. During this pursuit, the deputies came across the plaintiff

---

[41] Doc. 48, p. 14.

[42] The only case that the Court found to be somewhat on point is the unpublished case of *Hordych v. Borough of North East*, 2011 WL 3021736 (W.D. Pa. July 22, 2011), where the plaintiff argued failure to train because the municipality failed to provide additional training to officers after the officers graduated from the police academy. The district court rejected this argument, noting that the plaintiff failed to provide any evidence to support a finding that additional training was necessary.

[43] 361 Fed. Appx. 924 (10th Cir. Jan. 20, 2010).

walking home from the party. When the deputies saw the plaintiff, they ordered him to stop. It was undisputed that the plaintiff complied with the order, "lying face down on the ground with his hands out."[44] At that point, the deputies jumped on the plaintiff. "One deputy drove his knee into Mr. Herrera's back. A second deputy drove his knee into the back of Mr. Herrera's left knee. The third deputy grabbed Mr. Herrera's left leg and twisted it by the ankle."[45] The plaintiff suffered a torn meniscus and ligaments in his left knee and alleged excessive force. The deputies argued that they were entitled to qualified immunity, but the district court disagreed. On appeal, the Tenth Circuit upheld the district court's decision, holding that it was possible for a jury to find that the deputies had used excessive force by gang-tackling the plaintiff given the fact that, at the time of the tackle, the plaintiff was not actively resisting arrest.

The situation in *Herrera* is *vastly* different from the case now before the Court. First, Defendant Deputies have made no attempt to seek qualified immunity. Second, the facts of *Herrera* showed a *compliant* plaintiff. In his Complaint, Plaintiff alleges that after the vehicle came to a stop Defendant Deputies and other officers "ordered [him] out of the truck, and he complied. He was unarmed and offered no resistance."[46] However, the dashcam video shows that Plaintiff exited the vehicle without being told to do so, "flipped off" law enforcement, and, instead of turning around and backing up as he was clearly ordered to do, walked directly toward the deputies and raised his hands to his waist near his pockets. It was at that point that the deputies took him to the ground.

---

[44] *Herrera*, 361 Fed. Appx. at 926.

[45] *Id.*

[46] Doc. 1, p. 2.

-17-

Aside from *Herrera*, Plaintiff offers no evidence that the Tenth Circuit has found "gang-tackling" to be excessive force. During oral argument, Plaintiff mentioned a Ninth Circuit case in which the court held that "gang-tackling" is a *per se* constitutional violation and, as such, is always an inappropriate response.[47] As the Court noted on the record, and Plaintiff conceded, decisions from the Ninth Circuit are not binding on this Court.

Furthermore, while Plaintiff would have the Court believe that these cases stand for the proposition that "gang-tackling" is *per se* unconstitutional, a plain reading of these decisions shows that Plaintiff is incorrect. Rather, the cases hold that in the particular situations presented, namely an arrest of a compliant individual, the acts of the involved law enforcement officials constituted excessive force. Neither Circuit gave any indication that, because of its finding in the particular case at hand, "gang-tackling" was *always* inappropriate.

Additionally, Plaintiff relies somewhat on the theory that Defendant Deputies could have used a Taser to control Plaintiff, rather than physical force. As noted by Defendants both in the Pretrial Order and during the hearing, law enforcement officers are not legally required to use only the least intrusive degree of force necessary to be constitutionally permissible. Rather, officers are simply required to use only the amount of force that is reasonable.

In sum, at least with regard to the deliberate indifference prong, Plaintiff may prove his case by showing either a "pattern of tortious conduct" or that "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction."[48]

---

[47] Although Plaintiff did not mention the case caption on the record, he likely cites to *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (holding that "gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect – especially one who had been cooperative in the past and was at the moment not actively resisting arrest – was a violation of that person's *Fourth Amendment* rights.").

[48] *Carr*, 337 F.3d at 1229.

Here, Plaintiff fails to show any pattern of tortious conduct. Nor does he show that his injuries were a highly predictable or plainly obvious consequence of the Department's alleged failure to train. Defendant Deputies underwent hundreds of hours of certified training, both in the classroom and in the field. This training took place after 2006 and, for Deputies Slay and Maxfield, as recent as 2008. Sheriff Myers concedes that this training was appropriate. It is therefore inconceivable that the Department showed deliberate indifference with regard to the training of its deputies. As such, Plaintiff fails to satisfy the third requirement of a failure to train claim.

As to the fourth requirement, Plaintiff points to no evidence in the record of a direct causal link between the constitutional deprivation and inadequate training. "[I]n order for liability to attach in a failure to train case, 'the identified deficiency in a [municipality's] training program must be so closely related to the ultimate injury,' so that it 'actually caused' the constitutional violation."[49] During oral argument, Plaintiff attempted to engage the Court in somewhat of a circular analysis, arguing that Defendant Deputies' conduct was improper, given Plaintiff's injuries, and that since Defendant Deputies, as well as the former Sedgwick County Sheriff, testified that they did what they were trained to do, the training *had* to be improper. However, this type of *post hoc, ergo propter hoc* fallacy is exactly what the Tenth Circuit rejected in *Carr*.[50]

Here, Plaintiff fails to allege any deficiency in the Department's training program with respect to the use of excessive force. Plaintiff further fails to explain how any alleged deficiency

---

[49] *Brown*, 227 F.3d at 1290 (quoting *City of Canton*, 489 U.S. at 390).

[50] *See Carr*, 337 F.3d at 1231 (finding that the plaintiff's assertion of alleged failure to train "flunked" the causation requirement, "for they uniformly partake of the post hoc, ergo propter hoc fallacy rather than providing any evidence of how the training (or lack thereof) actually resulted in excessive force.").

is "closely related" to his injury so that it caused the alleged constitutional deprivation. Plaintiff has therefore failed to "go beyond mere allegations that officer training is deficient" to properly establish a claim for failure to train.[51] As such, the Court concludes that summary judgment in favor of Defendants on this issue is appropriate.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. 41) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 9th day of June, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[51] *Newell*, 276 F. Supp. 2d at 1158 (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1998)).